# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MICHAEL MOREL and TERESA MOREL** | * **CIVIL ACTION NO.** |
| | * |
| | * |
| **Plaintiffs,** | * **JUDGE** |
| | * |
| **vs.** | * |
| | * **MAGISTRATE JUDGE** |
| **U.S. XPRESS, INC. and WALMART INC.** | * |
| | * |
| | * |
| **Defendants.** | * |

* * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Michael Morel ("Mr. Morel" or "Plaintiff"), and Teresa Morel ("Ms. Morel") (collectively, "Plaintiffs") who file this instant Complaint against Defendants, U.S. Xpress, Inc. ("Xpress") and Walmart Inc. ("Walmart"), and assert as follows:

1. This is an action to halt and seek redress for the unlawful discrimination that Defendants have implemented in their business practices.

2. The Americans with Disabilities Act ("ADA") expressly prohibits discrimination in employment on the basis of a disability. 42 U.S.C. §§ 12101, *et seq.*

3. The Louisiana Employment Discrimination Law requires that a covered employer may not discriminate on the basis of race, color, religion, sex, national origin, or disability status. La. R.S. 23:301, *et seq.*

4. The Rehabilitation Act provides that no "individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits

1

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

5. Title VII of the Civil Rights Act of 1964 makes it illegal to retaliate against, harass, or discriminate against someone on the basis of a protected class. 42 U.S.C. §§ 2000e, *et seq.*

6. Despite these mandated provisions, Defendants have violated Plaintiffs' rights.

## PARTIES

7. Michael Morel (hereinafter "Mr. Morel"), is of the age of majority and a resident of the State of Louisiana.

8. Teresa Morel (hereinafter "Ms. Morel"), is of the age of majority and a resident of the State of Louisiana.

9. U.S. Xpress, Inc. ("Xpress" or "Defendant") is a non-Louisiana business corporation registered in Nevada but is authorized to do business in Louisiana. Its Registered Agent is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802.

10. Walmart Inc. ("Walmart" or "Defendant"), a foreign corporation licensed to do, and doing business in the State of Louisiana, who at all relevant times maintained a principal business establishment in the Parish of Tangipahoa, State of Louisiana. Its Registered Agent is CT Corporation System, 3487 Plaza Tower Dr., Baton Rouge, LA 70816.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

12. On January 24, 2020, Mr. Morel timely filed a Charge of Discrimination, Charge No. 461-2020-00293 with the United States Equal Employment Opportunity Commission ("EEOC") against Xpress.

13. The EEOC mailed a Notice of Right to Sue letter on April 2, 2020.

14. Then, on February 6, 2020, Mr. Morel Mr. Morel timely filed another Charge of Discrimination, Charge No. 461-2020-01011 with the United States Equal Employment Opportunity Commission ("EEOC") against Walmart.

15. Venue is proper because Defendants' violative behavior occurred in this District.

16. The Court has jurisdiction over the Defendants because they are located and operate in the State of Louisiana.

## **BACKGROUND**

17. Mr. Morel first began work with U.S. Express July 28, 2018 as a Transportation Supervisor II earning $50,000 per year.

18. Mr. Morel interviewed with Clayton Ziegler (Depot Manager), during which Mr. Morel notified him of limitations due to past knee replacements.

19. Mr. Morel suffers with a non-paralytic orthopedic disability, which among other limitations, prevents Mr. Morel from traversing stairs more than two to three times per day without substantial pain and further damage to his knee.

20. Mr. Morel offered to present documents certifying his disability to Ziegler during the interview, but he declined, stating to Mr. Morel that he did not need it.

21. At no time during the interview with Zielgler, was Mr. Morel informed that the position for which he was applying required climbing flights of stairs multiple times per day.

22. After a few weeks of struggling with this previously undisclosed requirement, Mr. Morel sent an email to Beverly Cleary discussing his concerns about the stair climbing, which required him to traverse approximately 25 to 30 times per day.

23. Mr. Morel also noted to Ms. Cleary that he had expressed his concerns to other U.S. Xpress employees, and those concerns were being ignored.

24. His accommodation request and its rationale were painfully simple—Mr. Morel could not continue traversing the stairs frequently, so he requested an accommodation which would not require him to.

25. Mr. Morel's job responsibilities were to ensure compliance with US Department of Transportation Regulations for his employer, Xpress, a carrier for Walmart.

26. At all times during Mr. Morel's employment with Xpress, Walmart owned the distribution center located at 45346 Parkway Blvd, Robert, LA 70455.

27. Mr. Morel worked mostly on the ground floor of the maintenance warehouse of the distribution center to ensure the compliance with transportation regulations, as well as supervising the dispatchers and the schedulers.

28. Plaintiff specifically requested an office downstairs as an accommodation. Upper management falsely told him that his office was located on the second floor and that nothing could be done about the office location unless Mr. Morel wanted to relocate to Texas.

29. Dr. Rolling provided a strict release that Mr. Morel could traverse the stairs two to three times per day at a maximum.

30. Mr. Morel was then told by Xpress's Human Resources department that some of his duties would be transferred to accommodate Dr. Rolling's stair restrictions.

31. Mr. Morel returned to work with insufficient accommodation: the restrooms were located downstairs, as was the management team for the Walmart distribution center with whom Mr. Morel was required to meet daily.

32. When Plaintiff complained about the insufficiency of the "accommodations," Stephanie Jackson, corporate manager, told him that he needed "to just get over his disability," and the accommodation for his disability – "was just not happening."

33. Upon information and belief, Walmart's transportation depot offered Xpress an office on the ground floor near the bathrooms in the transportation area. This offer was of course, declined by Xpress.

34. Only Mr. Morel, Clayton Ziegler, and some dispatchers and schedulers were located on the second floor.

35. Despite his employer's representation that his work restrictions would be accommodated, Mr. Morel still traversed the stairs 18 to 22 times per day.

36. On Friday September 28, 2018, Mr. Morel was going up the stairs after using the restroom to collect his keys to go to lunch.

37. When Mr. Morel reached the half-way point up the flight of stairs, his left knee buckled and gave way.

38. Mr. Morel was finally able to reach his office, where other employees inquired as to why his face had turned so white.

39. Mr. Morel informed them of the incident, and HR was called.

40. Mr. Morel was instructed to go to the emergency room.

41. He managed to get to his truck and was able to drive to the St. Tammany Hospital ER in Mandeville, LA where he was examined by hospital medical staff.

42. After the visit to St. Tammany ER, Mr. Morel's left knee was examined by Dr. Rolling.

43. Dr. Rolling started him on a physical therapy schedule at Audubon Physical Therapy.

44. Plaintiff sees physical therapist, Joe Zimmerman, for three sessions per week.

45. On Wednesday January 2, 2019, after physical therapy, Plaintiff was running a couple errands when his left knee buckled again, causing him to fall onto his left knee and left shoulder.

46. Upon returning home, Mr. Morel contacted Darian Rice (adjuster) who advised him to go straight to the emergency room for treatment.

47. At St. Tammany Parish Hospital, Mr. Morel was seen by the ER doctor and was told that he needed to see his orthopedic doctor for bone and soft tissue damage.

48. On Friday January 4, 2019, Plaintiff was evaluated again by Dr. Rolling, who after reviewing several of Mr. Morel's scans, determined that Plaintiff tore the bicep muscle in his left arm. Plaintiff was given a cortisone shot for pain relief, and Dr. Rolling ordered an MRI with a follow-up appointment three weeks after to discuss the MRI results.

49.  On Friday January 11, 2019 the MRI was completed, but Xpress refused to cover medical treatment related to Plaintiff's shoulder.

50. On Thursday January 14, 2019, Plaintiff saw Dr. Charles S. Schumacher, Jr., MD and was evaluated for total knee revision to damage caused by the initial incident on September 28, 2018.

51. On Wednesday January 23, 2019 Plaintiff fell at home, causing him to hit his head on a chest, rendering him unconscious.

52. Mr. Morel's dog was able to wake him up, at which point, Mr. Morel called his neighbor who called an ambulance. Plaintiff was transported to Lake View Regional Hospital where he was treated and released.

53. On Friday January 25, 2019 Plaintiff saw Dr. Schumacher who stated that Plaintiff needed to see the plastic surgeon ASAP, and that Plaintiff needed to walk with his walker because falling would likely damage the knee further.

54. On Saturday February 2, 2019 Mr. Morel fell again at home when his knee gave out. He did not seek medical treatment on this date but instead used ice and pain pills.

55. On Thursday February 14, 2019 Mr. Morel saw Dr. Schumacher in his office to address his fall on February 2, 2019.

56. Dr. Schumacher referred Mr. Morel to Dr. Chris Trahan, plastic surgeon, to set up a surgery. Dr. Schumacher took more x-rays and only observed the joint gap somewhat open.

57. On Saturday February 16, 2019, Mr. Morel had another fall at home when exiting the shower when his knee gave out. He did not seek medical treatment on this date but instead used ice and pain pills.

58. On Monday, February 25, 2019, Plaintiff saw Dr. Trahan in his office in New Orleans where he examined Plaintiff's left knee. Dr. Trahan informed Plaintiff that he wanted to proceed aggressively by removing the old skin and replacing it with a flap from Plaintiff's side area, making his knee much more stable.

59. On Wednesday February 27, 2019 Plaintiff's knee went out when he attempted to get out of bed. This caused him to fall against the wall. Plaintiff went to his next PT session, where and Joe Zimmerman, physical therapist, advised him to see Dr. Schumacher for x-rays and examination of the knee.

60. On Thursday February 28, 2019 Plaintiff arrived at Dr. Schumacher's for x-rays and a leg examination. He stated that Dr. Trahan wanted two more studies done by Dr. Pramod

Menon with the Louisiana Heart Center to check Plaintiff's arties, blood vessels and veins
before the total knee replacement and calf flap surgery.

61. On Monday April 1, 2019 Plaintiff arrived at St. Charles Surgical Hospital for surgery.

62. The surgery went without complication, and Plaintiff spent the next several nights in the
hospital with much discomfort.

63. Mr. Morel was released on Sunday April 7, 2019. He was sent home to receive home health
care through Americare. Three times per week, a nurse came to change the dressing, and a
physical therapist assisted Mr. Morel with rehabilitation exercises.

64. Plaintiff was readmitted to the hospital on April 11, 2019 and spent one night. Plaintiff was
administered iron supplements after a blood test was completed.

65. During this time, Ms. Morel, took three weeks of her sick time to be Mr. Morel's caretaker.

66. On May 15, 2019, panic attacks forced Plaintiff to visit the St. Tammany Parish ER Facility
in Mandeville. He had previously been prescribed Xanax to help with these panic attacks
as well as Ambien to help him sleep.

67. Plaintiff was told that he was sleep deprived, and that often sleep deprivation is side effect
from having a traumatic event like a major surgery. Plaintiff was prescribed phenobarbital
to help him sleep.

68. On May 18, 2019, Plaintiff went to St. Tammany Parish ER Facility in Mandeville because
of more panic attacks. He was prescribed Librium to help with the panic attacks and told
to follow-up with his doctor.

69. On May 20, 2019 Plaintiff had another panic attack while the home health nurse was at his
home. Plaintiff's neighbor took him to St. Tammany Parish ER in Covington, where he
was admitted overnight for cardio tests because of the severity of the panic attacks. Plaintiff

8

was released on May 21, 2019 with an appointment follow-up on May 22, 2019 with a psychiatrist. He was taken off Librium and phenobarbital and prescribed three new anxiety medications.

70. During an appointment with Dr. Chris Trahan May 21, 2019, Plaintiff was informed that his panic attacks may be related to PTSD from surgery.

71. On May 22, 2019 Plaintiff saw Christopher Ule, NP Ochsner Psychiatry in Mandeville who spoke with Plaintiff about his panic attacks, which Ule related to Mr. Morel's surgery.

72. On May 23, 2019 Plaintiff saw Dr. Trahan again to cauterize some tissue which was growing too fast.

73. On May 23, 2019, while in Dr. Trahan's office, Plaintiff received a voicemail from Andria Sparks, Xpress human resources.

74. In this voicemail, Ms. Sparks stated that Plaintiff was terminated on May 23, 2019 because they did not have a return to work date on file.

75. On May 29, 2019 Mr. Morel saw his primary physician for help with his apparent surgery-related panic attacks.

76. During this appointment, Dr. Richard Long, DO, burst into the examining room, shouting at Mr. Morel proclaiming he was a "pill head."

77. Despite Mr. Morel's multiple fervent attempts to explain the onset of his surgery-related panic attacks, Dr. Long threw several pages of Plaintiff's prescription history at him, all while shouting that he will never prescribe any medications to Mr. Morel again because he is "a pill head" and his "brain is warped."

78. On June 24, 2019, Mr. Morel emailed Ms. Sparks requesting his termination paperwork. Additionally, he left two voicemails with no response. At this time, Mr. Morel had received no termination paperwork, or even a follow-up call.

79. On July 21, 2019 while Mr. Morel was in the shower, his left knee hyperextended and caused a great deal of pain and discomfort.

80. Following the fall, Mr. Morel made appointment with Dr. Rolling as Dr. Schumacher was out of town. After examining Mr. Morel's knee and x-rays, Dr. Rolling opined that Mr. Morel's knee pain is potentially resulting from an over-stretched nerve.

81. On August 15, 2019, Plaintiff saw Dr. Schumacher after his nurse discovered a golf ball-sized knot in the rear upper part of his left leg calf muscle. Dr. Schumacher stated that there was no blood clot, but Plaintiff tore his gastrocnemius muscle when he hyperextended his knee in July.

82. The next day, Plaintiff saw Dr. Rolling after falling in the backyard. Dr. Rolling told Plaintiff that his tear had worsened.

83. Later that night, Plaintiff went to Mandeville St. Tammany Parish Hospital ER, and was transported to Covington St. Tammany Parish Hospital at 3:30 a.m. the next morning due to cellulitis in his left leg.

84. Plaintiff stayed in St. Tammany Parish Hospital, from August 17, 2019 to August 19, 2019.

85. On August 20, 2019, Plaintiff checked himself out of St. Tammany Parish Hospital and went directly to St. Charles Surgical Hospital.

86. On August 23, 2019 transported by Acadian Shuttle to echocardiogram at Touro Hospital.

87. While there, Dr. Trahan brought in Dr. Markalain Dery an infectious disease doctor. Dr. Dery changed his course of treatment to penicillin.

88. On August 23, 2019, a pic line was installed in Mr. Morel's left arm for infusions.

89. August 27, 2019, Plaintiff was brought into surgery by Dr. Trahan for a two-inch incision in the lower outside left leg.

90. On August 29, 2019 at about 6:30 p.m., Mr. Morel was released from St. Charles Surgical Hospital. He was sent home with an infusion machine to dispense the penicillin every four hours, six weeks, tentatively.

91. Plaintiff was informed that home health would commence on August 30, 2019 to come twice a day to change out dressing in a sterile environment in the leg and to change out the penicillin bag in the dispenser.

92. During this time, Ms. Morel had to take the following days off from work: August 16, 26 and 27, 2019.

93. On September 25, 2019, Plaintiff started physical therapy again with Joe Zimmerman at Audubon Physical Therapy three days per week.

94. On October 28, 2019 Plaintiff saw Dr. Schumacher, who took x-rays and examined his left knee. Dr. Schumacher stated that his blood results were concerning because of the infection in his left leg. Additionally, Mr. Morel was informed his MCL may be torn, causing him a great deal of discomfort.

95. November 18, 2019, Plaintiff saw Dr. Trahan, who stated that the leg is healing great and that Mr. Morel should see him in February of 2020 to discuss completing the surgery of connecting the saphenous vein back together.

96. On December 9, 2019, Plaintiff saw Dr. Schumacher, who confirmed that the saphenous vein needs to be reattached when he gets older.

97. As a result of Defendants' refusal to accommodate Mr. Morel's disability, Mr. Morel is now forced to use a cane to walk for the rest of his life.

### COUNT I VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

98. The preceding paragraphs are incorporated as if fully stated herein.

99. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* at § 12112(b)(5)(A).

100. The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111(8). "Reasonable accommodation" may include "job restructuring, part-time or modified work schedules...." *Id.* at § 12111(9)(B). The "undue hardship" analysis requires courts to consider factors including "the nature and cost of the accommodation;" the size of the facility and the business entity involved in terms of financial resources, personnel, and geography; and the type of operations including composition, structure, and function. *Id.* at § 12111(10)(B).

101. "Once an employee makes a request for reasonable accommodations, the employer is obligated by law to engage in an 'interactive process' or 'a meaningful dialogue with the employee to find the best means of accommodating that disability." *Tribble v. Ouachita*

12

*Parish Police Jury,* 939 F.Supp.2d 626, 632, 2013 WL 1411810, at *5 (W.D.La.2013)

(citing *E.E.O.C. v. Chevron Phillips Chem. Co.,* 570 F.3d 606, 621 (5th Cir.2009)).

102.     Once employer has been put on notice of employee's need for accommodation, Americans with Disabilities Act obligates both parties to engage in good-faith interactive process to develop reasonable accommodation. Americans with Disabilities Act of 1990, § 102(b)(5), 42 U.S.C.A. § 12112(b)(5).

103.     EEOC regulations have codified this understanding in the definition of "reasonable accommodation." The term is defined to include, *inter alia,* (1) modifications that enable the employee to perform the essential functions of her position and (2) modifications that enable the employee "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." *Picard v. St. Tammany Par. Hosp.*, 611 F.Supp.2d 608, 620 (E.D. La.2009) (citing 29 C.F.R. § 1630.2; *see also Agro Distribution,* 555 F.3d 462, 470 (5th Cir.2009) (noting that a reasonable accommodation is one that is "sufficient to meet the job-related needs of the individual being accommodated"); EEOC Interpretive Guidance on Title I of the ADA, 29 C.F.R. pt. 1630, app., § 1630.9 ("The reasonable accommodation that is required by this part should provide the qualified individual with a disability with an equal employment opportunity.")).

104.     There are several components to an employer's duty to provide reasonable accommodations. First, an employer is under a duty only to reasonably accommodate its employees' "known physical or mental limitations." 42 U.S.C. § 12112(b)(5) (emphasis added).

13

105.    In general, it is the employee's burden to make his need for an accommodation known to the employer. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir.1999).

106.    Once the employer has been put on notice of its employee's need for an accommodation, the ADA obligates both parties to engage in a good faith interactive process to develop a reasonable accommodation. *Jenkins*, 487 F.3d at 316.

107.    The EEOC has outlined a sequence of four steps that serves as a model for the interactive process:

(1) Analyze the particular job involved and determine its purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

108.    Among other things, reasonable accommodations may include: job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or

interpreters, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9)(B).

109.     Since failure to reasonably accommodate employee's disability is, by definition, failure to provide that employee with equal employment opportunity, it is unnecessary to prove separate "adverse employment action" element in failure to accommodate case under Americans with Disabilities Act (ADA). Americans with Disabilities Act of 1990, § 102(a), 42 U.S.C.A. § 12112(a); 29 C.F.R. § 1630.2.

110.     In order to prove a claim of discrimination under the ADA, a plaintiff must satisfy the elements of 42 U.S.C. § 12112(b)(5): (1) he had a disability; (2) he was qualified for the job; (3) his employer knew of the disability; (4) he requested an accommodation; (5) a reasonable accommodation existed that would have allowed him to perform the essential functions of the job; and (6) his employer failed to provide a reasonable accommodation. 42 U.S.C. § 12112(b)(5)(A); *Mascarella v. CPlace Univ. SNF, LLC*, 13-CV-642-SDD-RLB, 2015 WL 2414518, at *9–10 (M.D. La. May 20, 2015) (citing *Heard v. United Parcel Service, Inc.,* No. 09–1950, 2012 WL 399213, at *8 (W.D.LA. Feb. 7, 2012); *Riel v. Elec. Data Sys. Corp.,* 99 F.3d 678, 683 (5th Cir.1996); *Burch v. Coca–Cola Co.,* 199 F.3d 305, 315 (5th Cir.1997)).

111.     In the instant case, Mr. Morel clearly had a disability recognized by the ADA, as his knee condition prevents him from performing essential functions of his employment.

112.     Secondly, Mr. Morel was clearly qualified for the job, as he occupied the position without incident.

113.     Third, Mr. Morel's employer knew about his disability, as he verbally informed his supervisors and provided documentation.

114.     Fourth, Mr. Morel requested an accommodation reducing the number of instances per day he would have to traverse the stairs.

115.     Fifth, a reasonable accommodation existed that would have allowed Mr. Morel to complete the essential functions of his job, as he could have been relocated to an office or workplace that would not require him to traverse the stairs to reach the restroom or the Walmart managers with whom he was required to communicate. Further, his employer outright refused Walmart's offer of a first-floor office, in which Mr. Morel could have been stationed.

116.     Sixth, Mr. Morel's employer failed to provide a reasonable accommodation for Mr. Morel's disability—Mr. Morel still had to traverse the stairs an excessive number of times per day, causing substantial further damage to Mr. Morel's knee and shoulder.

117.     His employer engaged in no interactive process or meaningful dialogue with the Mr. Morel to find the best means of accommodating that disability. See *E.E.O.C. v. Chevron Phillips Chem. Co.,* 570 F.3d 606, 621 (5th Cir.2009). Instead, he was told that his requested accommodation "was just not happening."

118.     Additionally, Defendant violated the ADA when it terminated Mr. Morel while he was recovering from major knee surgery.

## COUNT II VIOLATION OF LA EMPLOYMENT DISCRIMINATION LAW

119.     The preceding paragraphs are incorporated as if fully stated herein.

120.     The Louisiana Employment Discrimination Law requires that a covered employer may not discriminate on the basis of race, color, religion, sex, national origin, or disability status. La. R.S. 23:301, *et seq.*

121.     Defendants employ far more than twenty full time employees and is therefore a

covered employer under La. R.S. 23:302.

122.     As detailed in the ADA allegations outlined above, Mr. Morel suffered

discrimination on the basis of his disability.

123.     Regarding the LEDL, the Fifth Circuit emphasized: "Louisiana's anti-

discrimination statute, La. Rev. Stat. Ann. § 23:301 et seq., is "substantively similar" to

Title VII, and Louisiana courts routinely look to the federal jurisprudence for guidance.

*Trahan v. Rally's Hamburgers, Inc.*, 696 So.2d 637, 641 (La.App.1st Cir.1997).

124.     In addition, the Fifth Circuit has extended Title VII hostile work environment

jurisprudence to disability-based harassment claims under the ADA. *See Flowers*, 247 F.3d

at 234–36.

125.     Thus, claims brought under the LEDL are analyzed using the same framework and

precedent as ADA claims. *Johnson v. JP Morgan Chase Bank, N.A.*, 293 F.Supp.3d 600,

615 (W.D. La.2018) (citing *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th

Cir.1989); and quoting *Scott v. Turner Indus. Grp., LLC*, 2011 WL 5023840, (M.D. La.

Oct. 19, 2011) ("The ADA and LEDL provide similar rights and remedies, such that

Louisiana courts routinely reference federal ADA jurisprudence when considering LEDL

claims.")).

126.     As such, Defendants are in violation of the Louisiana Employment Discrimination

Law.

### COUNT III: VIOLATION OF THE REHABILITATION ACT

127.     The preceding paragraphs are incorporated as if fully stated herein.

128.     The Rehabilitation Act provides that no "individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

129.     The Rehabilitation Act does not incorporate Title I's requirement that the defendant be the plaintiff's "employer" as that term is defined in the ADA. Unlike Title I of the ADA, Section 504 of the Rehabilitation Act is not limited to the employment context.

130.     Title I prohibits discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Section 504 of the Rehabilitation Act, by contrast, is far broader.

131.     The Rehabilitation Act prohibits discrimination "under any program or activity receiving Federal financial assistance," and "program or activity" is defined to include "all of the operations of ... an entire corporation, partnership, or other private organization, or an entire sole proprietorship."

132.     Thus, based on the plain language of the statute, "the Rehabilitation Act covers 'all of the operations' of covered entities, not only those related to employment." *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 427–28 (5th Cir.2016) (citing *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 942 (9th Cir.2009) (quoting 29 U.S.C. § 794(b)). *Accord Schrader v. Fred A. Ray, M.D., P.C.*, 296 F.3d 968, 972 (10th Cir.2002) (citing *Johnson v. N.Y. Hosp.,* 897 F.Supp. 83, 86 (S.D.N.Y.1995))).

133.     Upon information and belief, Walmart owns the distribution center where Mr. Morel was primarily located while employed by Xpress.

134.     Upon information and belief, Xpress leases office space from Walmart in order to fulfill contractual obligations owed to Walmart.

135.     Upon information and belief, Walmart is a "program or activity receiving Federal financial assistance."

136.     Walmart violated the Rehabilitation Act when it operated a distribution center with insufficient first floor offices to accommodate Mr. Morel's physical disability, thus forcing him to travel up and down the stairs in excess of 20 times per day, causing him to severely injure his knee and shoulder.

137.     Mr. Morel's disability was the exclusive reason why he was unable to perform his job functions without incurring further injury.

138.     Count VI LOSS OF CONSORTIUM

139.     The preceding paragraphs are incorporated as if fully stated herein.

140.     Loss of Consortium is defined as the loss of love, companionship, comfort and services which a family member might have provided if she had not been injured.

141.     The following factors are considered in evaluating a claim for loss of consortium: loss of love and affection, loss of companionship and moral support, plaintiff's decreased ability to perform household services, decreased aid and assistance from plaintiff in the family unit, and a loss of felicity or overall contentment and happiness. *Ferrell v. Fireman's Fund Ins. Co.*, 696 So.2d 569, 572 (La.1997).

142.     Additionally, a result of Defendants' refusal to accommodate Mr. Morel's disability and his subsequent wrongful termination, Plaintiffs' marriage has been adversely affected, resulting in loss of services, loss of support, and loss of quality in the relationship.

**JURY DEMAND**

Plaintiffs hereby notify the Court and Defendants of their intent to seek a trial by jury.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that after due proceedings be had, there be judgment in their favor:

a. Appropriate injunctive relief, including but not limited to an order restraining Defendants from engaging in further discriminatory conduct of the types alleged in this Petition,

b. Compensatory and consequential damages,

c. Punitive damages against Defendants,

d. Pre-judgment and post-judgment interest at the highest lawful rate,

e. Attorney's fees and costs of this action, and

f. Any such further relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED:

_____
Galen M. Hair, LA Bar No. 32865
David P. Vicknair, LA Bar 34135
Madison C. Pitre, LA Bar No. 38867
**Scott, Vicknair, Hair & Checki, LLC**
909 Poydras Street, Suite 1100
New Orleans, Louisiana 70112
Phone: (504-684-5200)
Fax: (504-613-6351)

and

René Paul Frederick, LA Bar No. 27468
Matthew Ziifle, LA Bar No. 33444
René Frederick & Associates, LLC
112 N. Jefferson Avenue
Covington, Louisiana 70433
Telephone: 985.893.8484
Facsimile: 985.893.8118

Attorneys for Plaintiffs.